COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
DIVISION_____5_____
CIVIL ACTION #03-CI__0 3 5 8 0____

MARSHA JOHNSON AND                                          **PLAINTIFFS**
RAGAN JOHNSON,                    **AUG 2 6 2003**
CO-ADMINISTRATRIX OF THE
ESTATE OF SHEA JOHNSON

V.          **COMPLAINT FOR DAMAGES WITH JURY DEMAND**

~~SONNET COVE APARTMENTS AND~~
PINNACLE REALTY MANAGEMENT COMPANY,
AND PINNACLE REALTY MANAGEMENT COMPANY D/B/A
SONNET COVE APARTMENTS

     SERVE:     CSC Lawyers Incorporating Services
                     421 W. Main St.
                     Frankfort, KY 40601

AND

GRAOCH LIMITED PARTNERSHIP #73,
A WASHINGTON LIMITED PARTNERSHIP

     SERVE:     James Lobb
                     8311 Shelbyville Rd.
                     Louisville, KY 40222

AND

WALTER KIDDE PORTABLE EQUIPMENT, INC;                **DEFENDANTS**
INDIVIDUALLY, AND/OR D/B/A KIDDE SAFETY;
AND/OR WALTER KIDDE SMOKE AND FIRE ALARM

                     Agent for Service of Process:
                     Prentice Hall Corporation Systems, Inc.
                     327 Hillsborough St.
                     Raleigh NC, 27602.
     SERVE:     Secretary of State
                     Comonwealth of Kentucky
                     Frankfort, KY 40601

AND

UNKNOWN DEFENDANTS

482979.1

*****

For their Complaint, the Plaintiffs, Marsha Johnson and Ragan Johnson, as Co-Administratrix of the Estate of Shea Johnson, by and through counsel, state:

1.     Plaintiff, Marsha Johnson is a resident of Mexico City, Mexico.

2.     Plaintiff, Ragan Johnson, is a resident of Lexington, Fayette County, Kentucky.

3.     At the time of her death, September 1, 2001, Plaintiffs' decedent, Shea Johnson, was a resident at Sonnet Cove Apartments, 2120 Manor Drive, Apt. #135, Lexington, Kentucky.

4.     Plaintiffs, Marsha Johnson and Regan Johnson were appointed Co-Administratrix of the Estate of Shea Johnson by Order of the Fayette District Court on August 27, 2002.

5.     The Defendants, Sonnet Cove Apartments, Pinnacle Realty Management Company and Pinnacle Realty Management Company d/b/a Sonnet Cove Apartments (hereinafter "Pinnacle/Sonnet Cove") were at all times mentioned herein managers, rental agents, leasing agents, operators and proprietors of Sonnet Cove Apartments, an apartment complex located at 495 Laketower Drive, Lexington, Kentucky.

6.     The Defendant, Graoch Limited Partnership #73, a Washington limited partnership, (hereinafter "Graoch") was at all times mentioned herein the owner of the Sonnet Cove Apartment Complex located at 495 Laketower Drive, Lexington, Kentucky.

7.     The Defendants, Walter Kidde Portable Equipment, Inc., individually and/or d/b/a Kidde Safety and/or Walter Kidde Smoke and Fire Alarms (hereinafter "Kidde") is believed to be a Delaware Corporation, which may be authorized to do business in this Commonwealth, and therefore, is authorized to sue and to be sued in the Courts of the

482979.1

Commonwealth of Kentucky. Said Defendant has in fact placed its products into the stream of commerce for retail sale in Kentucky and is subject to the jurisdiction of the Courts in Kentucky pursuant to KRS 454.210. Said Defendants' agent for service of process is Prentice Hall Corporation Systems, Inc., 327 Hillsborough St., Raleigh NC, 27602. Its principal office is located at 1394 3rd Street Ext., Mebane, NC 27302-9711.

8. There may be other Defendants who at this time are unknown and unidentified who may be liable to the Plaintiffs for the injuries and damages set forth herein. They are included here as though identified and as such are joint tortfeasors for purposes of commencing this action against them, and an alias summons or summonses should issue.

### COUNT I

9. Beginning August 17, 2001, and continuing until her death on September 1, 2001, Shea Johnson, was a tenant of Defendants, Pinnacle/Sonnet Cove and Graoch and she leased an apartment from said Defendants along with three roommates at 2120 Manor Drive, Apt. #135 in Lexington, Kentucky. (A copy of said lease is attached and marked Exhibit 1 for identification).

10. Said Defendants including their agents, servants and employees had a duty to maintain said premises in a reasonably safe condition, free from dangerous defects, and to exercise reasonable diligence in correcting known defects and in performing necessary maintenance of safety devices in the premises including smoke detector/alarms. Defendants including their agents, servants, and employees had a duty to take measures to avoid injuries to other persons and to warn persons of defective or dangerous conditions on or about the premises.

482979.1

11.   On or about September 1 , 2001 , Shea Johnson was lawfully in the said premises of the Defendants when a fire began creating intense heat and smoke.

12.   Shea Johnson was injured in the fire from smoke inhalation and carbon monoxide poisoning which ultimately caused her death.

13.   The fire and resulting injuries and death of Shea Johnson were caused in part by the negligence of Defendants, Pinnacle/Sonnet and Graoch, and their agents, servants and employees who should have known of the existence of the defective condition of the smoke detector/alarm on the premises. Notwithstanding such knowledge, said Defendants, and their agents, servants, and employees failed to exercise proper care to keep and maintain the premises in a reasonably safe condition for the use of Shea Johnson. Said Defendants, and their agents, servants, and employees also failed to warn Shea Johnson of the defective or dangerous condition or to take steps to avoid causing or contributing to her injuries and death.

14.   The described acts and omissions of said Defendants, and their agents, servants, and employees were committed negligently and/or in total wanton and wilful disregard for the safety of Shea Johnson.

15.   As a direct result of the negligent and/or intentional acts or omissions of said Defendants, and their agents, servants, and employees, Shea Johnson suffered smoke inhalation, carbon monoxide poisoning, injury and death, all to her damage in destruction of her power to earn money, mental and physical anguish and destruction of her right to enjoy a full productive and happy life.

### COUNT II

16.   The Plaintiffs incorporate by reference the preceding averments as though fully set forth here.

482979.1

17.   At all times mentioned herein, Kidde was engaged in the design, manufacture, sale and distribution of smoke alarms which were sold or delivered for use in the Commonwealth of Kentucky among other states.

18.   The smoke alarm that failed in this case was defective in its design, workmanship, construction and manufacture and as a result was defective, unsafe and inadequate for the use for which it was made and intended to be used.

19.   The smoke alarm at issue in this case, because of its defective design, manufacture and production was inherently dangerous, in that it either failed to sound an alarm or sounded the alarm too late, and as a result, was unreasonably dangerous to be placed into the stream of commerce without an adequate and suitable warning to potential purchasers and users.

20.   The defective and improper design and manufacture of said smoke alarm was a substantial contributing factor in causing injuries to and the death of Shea Johnson and said Defendant, Kidde, is strictly liable to the Plaintiffs under section 402-B of the Restatement of Torts 2nd.

21.   As a direct result of Shea Johnson's injuries and death, her estate has been damaged in a sum of money in excess of the jurisdiction of this Court including, but not limited to, the destruction of her power to earn money, mental and physical anguish, lost enjoyment of life and funeral expenses.

### COUNT III

### IMPLIED WARRANTY OF MERCHANTABILITY

22.   Plaintiffs incorporate by reference the preceding averments as if fully set forth herein.

482979.1

23.    The Defendants were at all times material to this Complaint, the designers, distributors, vendors and/or providers of the defective smoke alarm at issue in this case.

24.    The Defendants impliedly warranted that the said smoke alarm was free from defects, merchantable and therefore, fit for ordinary purposes for which it was used on the date of the fire and smoke which injured and killed Shea Johnson.

25.    The Defendants product was defective and harmful as stated in the foregoing paragraph and was not merchantable.

26.    The Defendants therefore breached the implied warranty of merchantability.

27.    As a proximate result, of the said breach of implied warranty of merchantability, Shea Johnson suffered injuries, death and damages as set forth herein.

### COUNT IV

### (IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE)

28.    Plaintiffs incorporate by reference the preceding averments as if fully set forth herein.

29.    The Defendants were at all times relevant to this Complaint, the designers, manufacturers, distributors, vendors, merchants and/or providers of the defective smoke alarm at issue in this case.

30.    In placing the said smoke alarm into the stream of commerce, the Defendants knew or had reason to know the particular purpose for which purchasers or users such as Graoch, Pinnacle/Sonnet Cove, and Shea Johnson would use the smoke alarm.

31.    The Defendants not only knew of the use of the smoke alarm, but specifically marketed the smoke alarm for such use by the public.

482979.1

32.    The Defendants warranted that said smoke alarm was fit for the use for which the property owners and managers, Graoch and Pinnacle/Sonnet Cove and the user, Shea Johnson, put the smoke alarm.

33.    The smoke alarm was defective for the reasons set forth herein and was not fit for use by Graoch, Pinnacle/Sonnet Cove and/or Shea Johnson.

34.    The Defendants breached their implied warranty of fitness for a particular purpose.

35.    As a proximate result of the Defendant's breach of the implied warranty for a particular purpose, Shea Johnson suffered injuries, death and damages as set forth herein.

## COUNT V

36.    Plaintiffs incorporate by reference the preceding averments as if fully set forth herein.

37.    With full knowledge of the design defect existing in the smoke alarm that failed in this case, said Defendant, Kidde, failed to warn or to otherwise inform the public of the propensity of its alarm to fail.

38.    As a proximate result of said failure to warn, Shea Johnson suffered injuries, death, and damages as set forth herein.

## COUNT VI

39.    The Plaintiffs incorporate by reference the preceding averments as if fully set forth herein.

40.    That the above described conduct of the Defendants, Kidde, Pinnacle/Sonnet Cove and Graoch, was malicious in nature and was carried out with a flagrant indifference to the rights of others, including Shea Johnson and with a subjective awareness that such

482979.1

conduct could result in physical bodily harm and death.

41.     Accordingly, Plaintiffs are entitled to recover punitive damages pursuant to KRS 411.184 and KRS 411.186.

### COUNT VII

42.     The Plaintiffs incorporate by reference the preceding averments as if fully set forth herein.

43.     As a direct and proximate result of the above stated conduct, acts and omissions of the Defendants, the Estate of Shea Johnson has suffered the following damages:

A.     Destruction of Shea Johnson's power to earn money in an amount to be determined by the evidence at trial,

B.     Mental and physical pain and anguish in an amount to be determined by the evidence at Trial.

C.     Funeral expenses, including a monument and burial plot;

D.     Punitive damages in an amount to be determined by the evidence at trail, and

E.     Costs, expenses, attorney fees and all other reasonable relief to which she is properly entitled.

**WHEREFORE,** Plaintiffs, Marsha Johnson and Ragan Johnson, Co-Administratrix of the Estate of Shea Johnson, demand as follows:

1 .     A trial by Jury on all issues of fact herein;

2.     Compensatory damages against the Defendants in an amount to be determined by a jury sitting in the trial of these proceedings;

3. Punitive damages against the Defendants in an amount to be determined by a jury sitting in the Trial of these proceedings;

4. For Plaintiffs' costs herein expended, including reasonable attorney's fees;

5. For any and all other relief to which Plaintiffs may appear entitled;

6. For leave to file amended pleadings to conform to the evidence and proof.

RESPECTFULLY SUBMITTED,

WILLIAM C. SHOUSE
LANDRUM & SHOUSE LLP
106 West Vine Street
P.O. Box 951
Lexington, Kentucky 40507

BY: _____
ATTORNEYS FOR PLAINTIFFS

A True Copy
ATTEST: WILMA F. LYNCH, CLERK
FAYETTE CIRCUIT COURT

By: _____ Deputy

482979.1

SONNET COVE APARTMENTS    495 laketower Drive    LEXINGTON, KENTUCKY    40502    859-266-3125

## APARTMENT LEASE

*You are legally bound by this lease. Read carefully before signing.*

Date of lease: 08/17/01

3/60

| Moving In- General Information |
|---|

1. **PARTIES.** This lease is between *you*, the resident (*list all people signing the lease* Chea Johnson,Kathy Renfroe,Kathrine Haddix and *us*, the owner, **Sonnet Cove Apartments**. You've agreed to rent the apartment at **2120 Manor Dr., Apt# 135** in **Lexington, Kentucky, 40502** for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our," refer to Sonnet Cove Apartments, the owner listed above, and not to property managers or anyone else. If anyone else has guaranteed performance of this lease, a separate lease guaranty is attached.

2. **OCCUPANTS.** The apartment will be occupied only by you and (*list all other occupants not signing the lease only* occupant No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than 7 consecutive days without our prior written consent, and no more than twice that many days in any one month.

3. **LEASE TERM.** The initial term of the lease begins on the 17th day of August year **2001** ends at midnight the 31st day of August year 2002. This lease will automatically renew month-to-month unless either party gives written notice of termination or intent to move out as required by paragraph 37.

4. **SECURITY DEPOSIT** In accordance with Kentucky law, your security deposit in the amount of **$99.00** has been deposited in a non-interest bearing account in #616078440, Bank One Account. It is due on or before the date this lease is signed. Any animal deposit will be stated in an animal addendum. .Tenant acknowledges that tenant has received a list of damages existing in the tenant's unit prior to move-in, and that tenant has had an opportunity to inspect the premises to ascertain the accuracy of such listing prior to taking occupancy. Tenant acknowledges that he has signed such list of existing damages, or signed an attached statement detailing his objections to such list. Failure by tenant to sign such list or attach a statement detailing objections shall be deemed a waiver by the tenant.

5. **KEYS AND FURNITURE.** You will be provided 2  apartment key(s), 2 mailbox key(s),  and 0laundry room key(s). Your spouse or any other resident or occupant who has permanently moved out according to a remaining resident's affidavit is (at our option) no longer entitled to occupancy or keys. Your apartment will be **unfurnished.**

6. **RENT AND CHARGES.** You will pay $ **884.00** per month for rent, payable in advance and without demand at the on-site manager's office.. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless expressly authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in certified or cashier's check, money order, or one monthly check rather than multiple checks.
If you don't pay all rent on or before the 3rd day of the month and we haven't given notice to vacate before that date, you'll pay an initial late charge of $50.00 plus a late charge of $0.00 per day after that date until paid in full. Daily late charges will not exceed 15 days for any single month's rent. You'll also pay a charge of $35.00 for each returned check, plus initial and daily late charges from due date until we receive acceptable payment. If you don't pay rent on time, you'll be delinquent and all remedies under this lease will be authorized. If you violate the lease restrictions of paragraph 27 or other animal rules, you'll pay an initial charge of $100.00 per animal and a daily charge of $10.00 per animal from the date the animal was brought into your apartment until it is finally removed: and we'll have all other remedies for such violation.

7. **UTILITIES.** We'll pay for water, wastewater/sewage, pest control and trash, you'll pay for all other utilities, related deposits, and any charges, fees, or services on utility bills connected in your name. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, use only battery operated lighting. If the apartment is submetered for electricity, water, or gas, a submetering addendum is attached to this lease in compliance with state agency rules. If a mastermetered water bill or any central system costs for the apartment are prorated among our residents by an allocation formula, a utility allocation addendum is attached in compliance with applicable law.

8. **INSURANCE.** We urge you to get your own insurance for losses due to theft, fire, smoke, water damage, and the like. You intend to [check one]:

    ☒ not buy insurance to protect against such losses; or
    ☐ buy insurance from your own agent to cover such losses.

*If neither is checked, you acknowledge you will not have insurance coverage.*

9. **SECURITY. What we must provide.** At lease commencement, we will provide at our expense: (1) a keyed deadbolt

Initials of all residents  KER        1

EXHIBIT

lock or keyed doorknob lock or. _ least one entry door; (2) a keyless dead __, a keyed deadbolt lock, or a keyed doorhandle lock on each remaining exterior door; (3) a window latch on each window. We will also install at our expense any additional security device required by local government ordinance. Such devices will be in working order when you move in. We may at any time convert any *keyed* deadbolt lock into a *keyless* deadbolt by plugging the keyhole, provided at least one exterior entry door still has a keyed deadbolt lock. We may at any time deactivate locking mechanisms in doorknob locks if at least one entry door has a keyed deadbolt lock and each remaining entry door has a keyless deadbolt.

**What you may request.** At your expense and upon your written request at any time, we will provide the following within 14 days of your request: (1) a keyed deadbolt lock on the main entry door; (2) a pinlock on any sliding glass door; (3) a doorhandle latch and/or security bar on any sliding glass door viewer on any exterior door A pinlock is a pin, rod, or nail inserted in the stationary panel of a sliding glass door through a hole in the sliding panel or from a device mounted on the butt end of the bottom of the sliding panel. Requested security devices will be in working order when installed and will be provided only if the door doesn't already have the requested device. The quality, brand, and type of a security device is our decision. Installation will be in accordance with fire and building codes and other applicable laws, if any.

**Rekeying locks and deactivation of keyless deadbolts.** All keyed lock(s) have been rekeyed after the prior resident moved out or will be rekeyed no later than 7 days after you move in, at our expense. Thereafter, at your expense and upon your written request at any time, we will change or rekey locks or latches within 3 business days after your request. At your expense and upon your written request, we may deactivate a keyless deadbolt if you certify in writing that you or an occupant in the apartment is over 55 years of age or has a physical or mental disability. The deactivation request must be in a separate document and may not be included as part of the lease.

**Payment for Rekeying, repairs, etc.** You must pay for all repairs arising from misuse or damage by you or your family, occupants, or guests during your occupancy. Payment for additional or changed security devices which you request and for which you are responsible under this paragraph, is due in advance. Payment for rekeying or repairs to doors, windows, and security devices for which you are responsible, is due immediately after the work is done.

---

### Special Provisions and "What If" Clauses

10. **SPECIAL PROVISIONS.** The following special provisions and any addendum or written rules furnished to you at or before signing supersede any conflicting provisions of this printed lease form.
    concession

    See the last page for any additional special provisions.

11. **RELETTING CHARGE.** You'll be liable to us for a reletting charge of $ 884.00 (not to exceed 100% of the highest monthly rent during the lease term) if you:
    (1) fail to give written move-out notice required in paragraphs 23 or 37; or
    (2) move out without our written approval *and* without paying rent in full for the entire lease term or renewal period; or
    (3) move out at our demand because of your default; or
    (4) are judicially evicted.
    The reletting charge is not a cancellation fee and does not release you from your obligations under this lease. See the next paragraph.

    **Not a release.** The reletting charge is not a lease cancellation fee or buyout fee. It is an agreed-to liquidated amount covering only part of our damages, that is, our time, effort, and expense in finding and processing a replacement. Those amounts are uncertain and difficult to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, office overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys; or other sums due.

12. **REIMBURSEMENT.** You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to violation of the lease or rules, improper use, or negligence of you or your guests or occupants. Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following if occurring during the lease term or renewal period: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

13. **DISPOSITION OF PROPERTY LEFT IN YOUR APARTMENT AFTER SURRENDER, ABANDONMENT, OR EVICTION.**

Initials of all residents _KERE_ _____ 2 _PS_ _____

**Definition of surrender and abandonment of apartment.** You have "surrendered" the apartment when: (1) the move out date has passed and no one is living in the apartment in our reasonable judgement; or (2) all apartment keys listed in paragraph 5 have been turned in where rent is paid—whichever date occurs first.

You have abandoned the apartment when all of the following have occurred: (1) everyone appears to have moved out in our reasonable judgement; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgement; (3) you've been in default for nonpayment of rent for 10 consecutive days or any utility in the apartment not connected in our name has been disconnected or terminated; and, (4) you've not responded for two days to our notice left on the main entry door, stating that we consider the apartment abandoned. An apartment is also abandoned 10 days after the death of a sole resident.

**Entry and disposition of your property.** Immediately after surrender, abandonment, or eviction, we have the right to: enter and take possession of the apartment; remove, store, sell, or throw away property left in the apartment when authorized below; and exercise other rights under paragraph 42 relating to clean-up, repairs, and security deposit deductions.

**Removal of your property.** All property left in the apartment or common areas by you or others after eviction or after surrender or abandonment of the apartment may be removed by us or (law officers), at your expense.

**Storage of your property.** We may store but have no duty to store property removed after judicial eviction or after you have surrendered or abandoned the apartment. We're not liable for casualty loss, damage or theft of stored property. You must pay reasonable charges for our packing, removing, storing, selling, and disposing of such property.

**Redemption of your property.** If we've stored property under this paragraph, you may redeem it prior to sale or disposition under the following subparagraph by paying all sums you owe, including rent, late charges, reletting charges, storage, damages, attorneys fees, etc. You must pay reasonable charges for our packing, removing, and storage of such property. We may require payment by cash, money order, or certified check. If you request in writing, we will provide you an accounting of amounts owed. We may return redeemed property at the place of storage, the management office, or the apartment (at our option).

**Disposition or sale of your property.** Immediately after removal, we may throw away or give to a charitable organization property removed by us under this paragraph (except for animals and property removed after a death of a sole resident). If we've stored property under this paragraph, we will sell it by sale which will be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice will itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Animals removed after surrender, abandonment, or judicial eviction will not be sold; but we may board them at your expense or turn them over to local authorities or humane societies. If property is sold: the sale may be public or private, may be subject to any third party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item- by- item.

14. **FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the lease begins, all future rent will be automatically accelerated without notice and immediately due; and we may end your right of occupancy and recover damages, future rent, reletting charges, court costs, and other lawful charges. Our rights and remedies under paragraphs 11 and 32 apply to acceleration under this paragraph.

15. **RENT INCREASES AND LEASE CHANGES.** No rent increases or lease changes are allowed before the initial lease term ends, except for changes allowed by any special provisions in paragraph 10, by any signed written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 18. If, at least 35 days before the lease term or renewal period ends, we give you written notice (via certified mail or hand delivery) of rent increases or lease changes effective when the lease term or renewal period ends, this lease will automatically continue month to month with the increased rent or lease changes. The new modified lease will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 37.

16. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The lease will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing upon at least 5 days notice and must be delivered to our place of business through which the rental agreement was made or to any place held out by us as the place for receipt of communications, or mailed by certified mail to the landlord to either of the two locations listed immediately above. After termination, you are entitled only to refund of any security deposit paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

17. **DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law enforcement, governmental, or business purposes, we may provide it.

---

**While You're Living in the Apartment**

Initials of all residents _KER_ _____ 3 _PL_ _____

**18. COMMUNITY POLICIES OR R...S.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Any rules are considered part of this lease. We may make reasonable changes to written rules, effective immediately, if distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this lease.

**19. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and other common areas. You, your occupants, or guests may not anywhere in the apartment complex: use of kerosene lamps without our prior written approval; store anything in closets having gas appliances; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited— except that any lawful business conducted "at home" by computer, mall, or telephone is permissible if customers, clients, patients, and other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude guests, or others, who, in our judgement, have been violating the law, violating this lease or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or a person who refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You must notify us in writing of any anticipated extended absence from the premises in excess of 7 days no later than the first day of the extended absence. Under state statute, you will be responsible for any damages incurred as a result of your failure to notify us.

**20. PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: loud or obnoxious conduct; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in a way that may alarm others; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community.

**21. PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

    (1) has flat tires or other conditions rendering it inoperable; or
    (2) is on jacks, blocks, or has wheel(s) missing; or
    (3) has no current license or no current inspection sticker; or
    (4) takes up more than one parking space; or
    (5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
    (6) is parked in a marked handicapped space without the legally required handicap insignia; or
    (7) blocks another vehicle from exiting; or
    (8) is parked in a fire lane or designated "no parking" area; or
    (9) is parked in a space marked for other resident(s) or unit(s); or
    (10) is parked on the grass, sidewalk, or patio; or
    (11) blocks garbage trucks from access to a dumpster.

**22. RELEASE OF RESIDENT.** Unless you're entitled to terminate this lease under paragraphs 10, 16, 23, or 37, you won't be released from this lease for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**23. MILITARY CLAUSE.** Under the following circumstances, you may terminate the lease by giving us written notice if:

    (1) you are or become a member of the Armed Forces of any nation or extended active duty and receive change-of-station orders to permanently depart the local area or if you are relieved from active duty (subject to the exception noted below); or
    (2) you are deployed to a foreign country as a member of the United States Armed Forces and are not continuing to receive quarters allowance from the military.

In either case, termination notice will effectively terminate the lease 30 days after the next monthly rent payment is due. You must furnish us either a copy of the official permanent change-of-station orders or a deployment order or letter. Military permission for base housing doesn't constitute a permanent change-of-station order. After move-out, you're entitled to a return of your security deposit, less lawful deductions. If you know when signing or renewing the lease that you will be retiring or that your enlistment term will end before the end of the lease term, you will not be released from this lease without our prior approval. The release of a resident under this military clause will release the

Initials of all residents    KER      4    P.

resident receiving the change-~ ~tation or deployment orders and such resid~ s spouse or legal dependents, but not any remaining co-residents.

24. **RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors, keyed deadbolt locks, keyless deadbolts, window latches, and other security or safety devices. You agree to make every effort to abide by the Security Guidelines in paragraph 36.

**Smoke Detectors.** We'll furnish smoke detectors as required by any state or local government, and we'll test them and provide working batteries when you first take possession. If no law requires smoke detectors, we will at least provide one battery operated smoke detector when you move in. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We will comply with other requirements of any applicable government entity requiring smoke detectors. We may replace dead or missing batteries at your expense. You must immediately report smoke detector malfunctions to us. Neither you nor others may disable smoke detectors. You will be liable to us and others for any loss, damage, or fines from fire, smoke, or water if that condition arises from disabling or damaging the smoke detector or from your failure to replace a dead battery or report malfunctions to us.

**Casualty loss.** We're not liable to any resident, guest, or occupant for personal injury or damage or loss of property from fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, theft, or vandalism unless that injury or damage is caused by our negligence or failure to impose a duty imposed by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather— (1) keep the apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. You'll be liable to damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity. You should then contact our representative. You won't treat any of our security measures as an express or implied warranty of security or as a guarantee against crime or reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. We're not responsible for obtaining criminal history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law enforcement agency. You must also furnish us with the law enforcement agency's incident report number upon request.

25. **CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You have received a list of damages existing in the apartment prior to move-in, and you have had an opportunity to inspect the premises to check the accuracy of such listing. You must either sign the list or sign an attached statement detailing your objections to the list and must return a copy to us. (See also paragraph 4.) Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood paneled walls, unless our rules state otherwise. No water furniture, antennas, additional phone or TV cable outlets, satellite dishes, washing machines, alarm systems, or lock changes, additions, or rekeying is permitted unless your right to same is mandated by law or we've consented in writing. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors, furniture, telephone and cable TV wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

26. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS A REQUEST FOR SERVICE — REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY RELATED MATTERS—IT MUST BE IN WRITING OR CALLED INTO OUR OFFICE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying to or responding to any oral request regarding security or nonsecurity matters doesn't waive the strict requirement for written notices under this lease. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and

Initials of all residents _____ 5 _____

reconnections, taking into consi... ation when casualty insurance proceeds are ... ...ived. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this lease within a reasonable time by giving you written notice. If the lease is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

**27. ANIMALS.** No animals ( including mammals, reptiles, birds, fish, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum and post an animal deposit. An animal deposit is considered a general security deposit. We will authorize a support animal for a disabled person. We may require a written statement from a qualified professional, verifying the need for the support animal and we may charge an animal deposit for a support animal. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this lease. If an animal has been in your apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal violation charges and animal removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by leaving, in a conspicuous place in the apartment, 24 hours written notice of intent to remove the animal. Prior notice of entry in paragraph 28 is waived for these purposes. We may keep or kennel the animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon - request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

**28. WHEN WE MAY ENTER.** In case of an emergency, we may enter without your consent and without prior notice as provided under the law. Except in case of emergency or unless it is impracticable to do so, we will give you at least one day notice of our intent to enter your unit for the purposes listed below. You agree that the purposes and procedures below are reasonable.

Subject to the above provisions, repairers, servicers, or our representatives may peacefully enter the apartment at reasonable times for the following purposes: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke detector batteries; retrieving unreturned tools or appliances; preventing waste of utilities; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or rekeying unauthorized security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials) or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing entry by a law officer with a search or arrest warrant or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors, fire marshals, lenders, appraisers, contractors, prospective buyers, or insurance agents.

**29. MULTIPLE RESIDENTS OR OCCUPANTS.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the lease or rules, all residents are considered to have violated the lease. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of lease termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security deposit refunds may be by one check jointly payable to all residents; the check and any deduction itemizations may be mailed to one resident only.

---

**Substitute Residents**

---

**30. REPLACEMENTS, SUBLETTING, AND EARLY MOVE-OUT.**
Replacing a resident, subletting, or assignment is allowed only when we consent in writing. If departing or remaining residents procure a replacement resident acceptable to us before moving out and we expressly consent to the replacement or subletting, then:
    (1) a reletting charge will not be due;
    (2) an administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested; and
    (3) you will remain liable for all lease obligations for the rest of the original lease term.

**Procedures for replacement.** If we approve a replacement resident, then at our option (1) the replacement resident must sign this lease with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new lease. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right of occupancy or security deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new lease is signed.

Initials of all residents _K̲E̲R̲_       6   R̲           C̲A̲W̲

**Mitigation of damages.** If you move out early, we'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from replacement or subsequent residents against your liability for past due and future rent and other sums due.

---

### Default by Either Party

**31. DEFAULT BY OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 24;
(2) maintain fixtures, hot water, and heating and A/C equipment;!
(3) substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If we violate any of the above, you may terminate this lease and exercise other remedies under the law only as follows: (a) you must deliver to us written notice specifying the acts and omissions constituting the breach, stating that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice if the breach is not remedied in 14 days from the date of receipt of the notice; (b) if the breach is remediable by repairs, the payment of damages or otherwise, and we adequately remedy the breach before the date specified in the notice, the rental agreement shall not terminate by reason of the breach. If substantially the same act or omission which constituted a prior noncompliance covered by subsection (a) above for which notice was given recurs within 6 months, then you may terminate the rental agreement upon at least 14 days written notice specifying the breach and the date of termination of the rental agreement. You may not terminate for a condition caused by the deliberate or negligent act or omission of you, a resident of your unit, or any guests. Security deposits and prorated rent will be refunded as required by law.

**32. DEFAULT BY RESIDENT.** You'll be in default if (1) you don't pay rent or other amounts that you owe; (2) you or any guest or occupant violates this lease, apartment rules, or fire, safety, health, or criminal laws, regardless of whether arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in KRS 218A.500; (6) any illegal drugs or paraphernalia are found in your apartment; or (7) you or any occupant, in bad faith, make an invalid habitability complaint to an official or employee of a utility company or the government.

**Lease termination for nonpayment of rent.** If your default is for nonpayment of rent, we may give you written notice that your lease will terminate 7 days after you receive the notice if the rent is not paid in full by the end of those 7 days. If rent is not paid in full by the end of this 7-day period, your lease will terminate automatically (on the 8th day) without further notice. At our option, our written notice may give you a longer period in which to pay your rent.

**Lease termination for other reasons.** If the reason for your default is for other reason(s), we may deliver to you a written notice specifying the acts and omissions constituting the default and stating that your lease will terminate 14 days after your receipt of the notice if the default is not remedied by the end of those 14 days. If the default has not been remedied by the end of this 14-day period, or if the default cannot be remedied, your lease will terminate automatically (on the 15th day) without further notice. At our option, our written notice may give you a longer period in which to remedy your default. If substantially the same act or omission which constituted a prior default for which notice was given to you recurs within 6 months of that previous default, we may terminate the lease upon 14 or more days written notice to you, specifying the default and the date of termination of your lease.

Delivery of any of the above notices may be by: (1) regular mail, (2) certified mail, return receipt requested; (3) personal delivery to any resident; (4) personal delivery at the apartment to any occupant over 16 years old (5) affixing notice to the exterior of the apartment's main entry door. If notice is mailed, you are deemed to be in receipt of it two days after it is mailed. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent. After giving notice of default, notice to vacate, notice of lease termination, or filing an eviction suit, we may still accept rent or other sums due. Such filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right except when you have in a timely manner cured a default after notice. Accepting money at any time doesn't waive our rights to damages, past or future rent, or other sums.

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically and without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations under paragraph 30.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move out notice or our notice to vacate (or beyond a different move out date agreed to by the parties in writing). If a holdover occurs, then: (1) you must pay holdover rent in advance on a daily basis and such rent will be delinquent without notice or demand; (2) your rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us for all rent for the full term of the previously signed lease of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term-- for up to one month from the date of

Initials of all residents _K E P_  _M_  _B M_  _CWS_

notice of lease extension—by delivering written notice to you or your apartme... while you continue to hold over. We may also file suit for possession and recover up to three months periodic rent or threefold the damages sustained by us, whichever greater, plus attorney's fees.

**Eviction.** If you default, we may end your right of occupancy by giving you notice according to subparagraphs (a) or (b) above. Notice may be made by the notice procedure specified in subparagraph (b) above. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, past or future rent, or other sums, or to file or continue with eviction proceedings.

**Other remedies.** We may report unpaid amounts to credit agencies. Upon your default and early move out, you will pay us any amounts stated to be rental discounts in paragraph 10, in addition to other sums due. Upon your default, we have all other legal remedies, including suit for lease termination, possession, damages, rent, and all other monies due under the law and attachment for rent pursuant to applicable law. In an eviction suit, the prevailing party may recover from the nonprevailing party all other costs to the extent allowed by law. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorneys' fees and litigation costs). All unpaid amounts bear the highest lawful rate of interest (no less than 12%) per year from due date, compounded annually. You must pay all collection agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline. We may turn any returned checks over to law enforcement officials for prosecution according to law.

---

**General Clauses**

---

33. **MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This lease is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this lease or any part of it unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives. Our representatives must give you a written release when this lease entitles you to a release. No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written notice requirements, rental due dates, acceleration, or other rights isn't a waiver under any circumstances.

Exercising one remedy won't constitute an election or waiver of other remedies. All remedies are cumulative. This lease binds subsequent owners. Neither an invalid clause nor the omission of initials on any or all pages invalidates this lease. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our nonliability and nonduty apply to our employees, agents, and management companies. This lease is subordinate or superior to existing and future recorded mortgages, at lender's option. All lease obligations must be performed in the county where the apartment is located. All provisions of KRS Chapter 383 relating to residential leases shall apply to this lease.

34. **PAYING SUMS DUE.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 or utility payments subject to governmental regulations) first to your nonrent obligations, then to rent—regardless of notations on checks or money orders and regardless of when the obligations arise. All sums other than rent (which is due on the first) are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

---

**Security Guidelines for Residents**

---

35. **SECURITY GUIDELINES.** We'd like to give you some important safety guidelines. We recommend you follow the guidelines and use common sense in practicing safe conduct. Inform all other occupants in your dwelling, including any children you may have, about these guidelines.

**PERSONAL SECURITY—WHILE INSIDE YOUR APARTMENT**

1. Lock your doors and windows—even while you're inside.
2. Engage the keyless deadbolts on all doors while you're inside.
3. When answering the door, see who is there by looking through a window or peephole. If you don't know the person, first talk with him or her without opening the door. Don't open the door if you have any doubts.
4. If young children (who are old enough to take care of themselves) are left alone in your apartment, instruct them to engage the keyless deadbolt and not let anyone in when you are gone—regardless of whether they are total strangers or apartment maintenance or management personnel.
5. Don't put your name, address, or phone number on your key ring.
6. If you're concerned because you've lost your key or because someone you distrust has a key, ask the management to rekey the locks.
7. Dial 911 for emergencies. If the 911 number does not operate in your area, keep phone numbers handy for the police, fire, and emergency medical services. If an emergency arises, call the appropriate governmental authorities first, then call the management.
8. Check your smoke detector monthly for dead batteries or malfunctions.

Initials of all residents_____  8

9. Check your door locks, windows, latches, and other security devices regularly, be sure they are working properly.
10. If your doors or windows are un-secure due to break-ins or malfunctioning locks or latches, stay with friends or neighbors until the problem is fixed.
11. Immediately report the following to the management—in writing, dated, and signed:
   - any needed repairs of locks, latches, doors, windows, smoke detectors and alarm systems; and
   - any malfunctions of other safety devices outside your apartment, such as broken gate locks, burned out lights in stairwells and parking lots, blocked passages, broken railings, etc.
12. Close curtains, blinds, and window shades at night.
13. Mark or engrave your drivers license number or other identification on valuable personal property.

## PERSONAL SECURITY—WHILE OUTSIDE YOUR APARTMENT

14. Lock your doors while you're gone. If you have them, lock your doorknob lock, keyed deadbolt lock, sliding door pin lock, sliding door handle latch, and sliding door security bar.
15. Leave a radio or TV playing softly while you're gone.
16. Close and latch your windows when you're gone, particularly when you're on vacation.
17. Tell your roommate or spouse when you're going and when you'll be back.
18. Don't walk alone at night. Don't allow your family to do so.
19. Don't hide a key under the doormat or a nearby flowerpot. These are the first places a burglar will look.
20. Don't give any entry keys to anyone unless absolutely necessary.
21. Use lamp timers when you go out in the evening or go away on vacation. They can be purchased at most hardware stores.
22. Let the manager and your friends know if you'll be gone for an extended time. Ask your neighbors to watch your dwelling since the management cannot assume that responsibility.
23. While on vacation, temporarily stop your newspaper and mail delivery, or have your mail and newspaper picked up daily by a friend.
24. Carry your door key in your hand, whether it is daylight or dark, when walking to your entry door. You are more vulnerable when looking for your keys at the door.

## PERSONAL SECURITY—WHILE USING YOUR CAR

25. Lock your car doors while driving. Lock your car doors and roll up the windows when leaving your car parked.
26. Don't leave exposed items in your car, such as cassette tapes, wrapped packages, briefcases, or purses.
27. Don't leave your keys in the car.
28. Carry your key ring in your hand while walking to your car—whether it is daylight or dark, or whether you are at home, school, work, or on vacation.
29. Always park in a well-lighted area. If possible, try to park your car in an off-street area rather than on the street.
30. Check the back seat before getting into your car.
31. Be careful when stopping at gas stations or automatic teller machines at night—or anytime when you suspect danger.

## PERSONAL SECURITY AWARENESS

*We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.*

| When Moving Out |
| --- |

36. **MOVE-OUT NOTICE** Before moving out you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the lease or renewal term. You will still be liable for the entire lease term if you move out early (paragraph 22) except under the military clause (paragraph 23). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

   - You're move-out notice must be in writing. Oral move-out notice will not be accepted and will not terminate your lease.

   - Your move-out notice cannot terminate the lease sooner than the end of the lease term or renewal period.

   - The move-out date in your notice [check one]
     X   must be the last day of the month or
     ☐   may be the exact day designated in your notice.
     [If neither is checked, the first applies].

   - We must receive your move-out notice at least 60 days before your move-out date. However, if we receive your notice on the first, it will suffice for move-out on the last day of the month—provided that all other requirements above are met.

Initials of all residents _____ KER _____ _____ RI _____ _____

YOUR NOTICE IS NOT ACCEPTABLE _ IF IT DOES NOT COMPLY WITH ALL OF THE _ .OVE. Use our written move-out form. If you don't, you must obtain from our representative written acknowledgement that move-out notice has been received. If we terminate the lease, we must give you the same advance notice—unless you are in default.

**37. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 and 32. You're prohibited from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must surrender the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**38. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charge for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**39. MOVE-OUT INSPECTION.** Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**40. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing smoke detector batteries; utilities for repair or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing or storing property removed or stored under paragraph 13; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false-security-alarm charges unless due to our negligence; animal- related charges under paragraphs 6 and 27; government fees or fines against us for violation (by you, your occupant, or guest) of local ordinances relating to smoke detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100.00) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus court costs, and filing fees actually paid; any other sums due under this lease.

You'll be liable to us for: (1) key duplication charges if you fail to return all keys listed in paragraph 5 on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 32; and (3) a reletting fee if you have violated paragraph 11.

**41. DEPOSIT RETURNS.** At the termination of occupancy, we'll inspect the premises and compile a listing of any damage to the apartment which is the basis for any charge against the security deposit. You have the right to inspect the premises to ascertain the accuracy of such listing. If no rent is due at the time of move-out, surrender, or abandonment, we will mail you such list. You will have 60 days from the postmark date to contact us to receive your refund. If we have not received a response from you within 60 days of the postmark of our notification to you, we may remove the deposit from the account into which it was originally put, and retain it free from any claim by you or any person claiming it on your behalf.

*Surrender* and *abandonment* are defined in paragraph 13. Surrender, abandonment, and eviction ends your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, or eviction doesn't affect our duty to give you prorated credit for rent later received from others during the remainder of your lease term or renewal period. See also paragraph 13 relating to our rights regarding personal property left in the apartment.

---

## Signatures, Copies, and Attachments

**42. COPIES AND ATTACHMENTS.** This lease has been executed in multiple copies—one for you and one or more for us. Our rules, and community policies, if any, will be attached to the lease and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to this lease and are binding even if not initialed or signed.

Initials of all residents_____ KER [signatures] 10 PL [signature]

Sonnet Cove Apartment # 135
Date of Lease: 08/17/01

## Community Policies Addendum

The community policies are for the mutual benefit of all residents. Our intent is to provide a quiet, pleasant and attractive home. The Community policies are a part of this Standard Apartment Lease and you are legally bound by them. You also agree to observe such further reasonable Community policies as may later be required by us for the necessary, proper and orderly care of the Community.

1. In order to maintain the visual integrity of the Community, we required that only white lined drapes, blinds or shades visible in the windows when viewed from the outside. No stickers, posters, flags, towels, etc. are to be placed in or on the windows or doors.
2. To insure emergency access, you shall not alter any lock or install a new lock, or other attachment without our written consent. If a new lock or attachment is installed with our permissions, you must provide us with a key. There will be a $25.00 lockout fee for any lost or misplaced keys after hours payable upon gaining entry to your apartment.
3. For the quiet enjoyment of all residents, we do not permit any noise, music or other sounds at any time that disturb or annoy other residents.
4. Please enjoy the use of the pool and other common areas in accordance with the rules as posted. We welcome children at the swimming pool and other facilities where accompanied by an adult.
5. Prior written permission and evidence of insurance is necessary before acquiring any water-filled furniture.
6. Please use care when hanging pictures, etc. to avoid damage to walls, wallpaper, paneling and woodwork which could result in a deduction from your deposit.
7. Parking spaces for use by residents is on a first come basis unless designated by us in some other manner. No more than one auto related to one-bedroom apartments or two autos relating to larger apartments can be parked at the Community. All such autos will be parked only in areas that are provided for parking.

   No auto or other vehicle may be parked on the grass, in front of dumpsters, or in any other area not appropriately marked for vehicle parking. Motorcycles are to be parked in designated parking spaces only. Motorcycles are not to be parked in breezeways, on patios or in your apartment. We do not provide parking for trucks, boats, trailers, campers and any other non-passenger motor vehicles. All vehicles must be currently licensed and in good operating condition. Designated parking spaces are not to be used for storage.

   Any violation of the foregoing rules will subject the vehicle to being towed without notice at the owner's expense. You agree to hold us harmless and indemnify us if we are required to two the vehicle for your guests. We will not be liable for damages arising as a result of towing. All vehicles must be registered with the Community office Prior to being parked in the Community.
8. To maintain the visual appearance and quality of this Community, toys, bicycles or other devises must be stored inside of your apartment or in designated storage areas. Common areas, patios and balconies are not to be used for storage purposes.
9. No awnings or other projections, including air conditioners, television or radio antennas, or wiring shall be attached to or extended from the outside of the building.
10. The toilets, basins and other plumbing fixtures are not to be used for any other purpose other than those for which they were designed. No rubbish, rags or any other improper articles shall be thrown into them. Lessee is also responsible for damage caused to the garbage disposal by bottle caps, coins, flatware, grease, etc. Any damage resulting from misuse of such facilities shall be paid for by you.
11. LAUNDRY ROOM: We accept absolutely no responsibility for any lost, damaged or stolen items from the laundry room. Protect yourself by seeing to it you remove your belongings immediately upon the machine's completion. *You are expected to clean up after yourself in the laundry room*

### Roommate Policies

Sharing an apartment in our Community can be a rewarding and enjoyable experience for you. We welcome you to your new home and hope that the following clarification will aid you in having an enjoyable residency.

As roommates occupying this apartment we agree to and understand the following provisions:

12. Each roommate alone and together with the other roommate (s) named on the Standard Apartment Leases accepts full responsibility for all terms of the Standard Apartment Lease.
13. All roommates agree to the following:
    a. Vacating roommate (s) will visit the management office and sign the Security Deposit Relinquish Addendum to have their name (s) removed from the Standard Apartment Lease and releasing their security deposit to the continuing roommate (s). The vacating roommate (s) will be accompanied by the remaining roommate(s) who must also sign the Security Deposit Relinquish Addendum consenting to releasing the vacating roommate (s).
    b. A new roommate(s) will complete an application for Rental and be subject to normal qualifying procedures. When approval is given, a replacement Standard Apartment Lease will be prepared to include the new roommate (s).
14. The security deposit will remain in the deposit account until the apartment is totally vacated. Refunds shall be made in the joint names of the remaining roommates (s) and new roommate (s). Partial refunds shall not be made. Vacating roommate (s) may recover their share of the deposit from the remaining roommate 8s) or a new roommate (s).
15. In the event you do not follow the proper procedures for roommate changes, all residents on the original Standard Apartment Lease will be held responsible for the full term of the Lease and when all conditions of the Lease are fulfilled, the deposit will be refunded in the joint names of the original roommates.
16. We can accept only one monthly check for the full rental payment due each month. No partial payments will be accepted.

Read before Signing

Resident _[signature]_

Resident _[signature]_

Resident _[signature]_

Agent for Sonnet Cove _[signature]_

Initials of all residents _[initials]_ _[initials]_ 1

# PINNACLE REALTY MANAGEMENTCOMPANY CRIME FREE AND DRUG FREE HOUSING ADDENDUM

IN CONSIDERATION OF THE EXECUTION OR RENEWAL OF A LEASE OF THE PREMISES KNOW AS SONNET COVE APARTMENTS, LANDLORD AND TENANT AGREE AS FOLLOWS:

1. TENANT AND ANY MEMBER OF THE RESIDENT'S HOUSEHOLD, OR A GUEST OTHER PERSON UNDER THE RESIDENT'S CONTROL, SHALL NOT ENGAGE IN CRIMINAL ACTIVITY, INCLUDING DRUG-RELATED CRIMINAL ACTIVITY ON OR NEAR THE PREMISES. "DRUG-RELATED OR CRIMINAL ACTIVITY" MEANS THE ILLEGAL MANUFACTURE, SALE, DISTRIBUTION, USE, OR POSSESSION WITH THE INTENT TO MANUFACTURE, SELL, DISTRIBUTE, OR USE OF A CONTROLLED SUBSTANCE (AS DEFINED IN SECTION 102 OR THE CONTROLLED SUBSTANCE ACT [21 U.S.C. 802] ).

2. NEITHER RESIDENT, NOR ANY MEMBER OF RESIDENT'S HOUSEHOLD OR OR OTHER PERSONS AFFILIATEDWITH THE RESIDENT, SHALL ENGAGE IN ANY ACT INTENDED TO FACILIATE ANY CRIMINAL ACTIVITY, INCLUDING BUT NOT LIMITED TO DRUG-RELATED CRIMINAL ACTIVITY, ON OR NEAR THE SAID PREMISES.

3. NEITHER RESIDENT, NOR ANY MEMBER OF RESIDENT'S HOUSEHOLD OR GUESTS OR OTHER PERSONS AFFILIATD WITH RESIDENT, SHALL PERMIT THE DWELLING UNIT TO BE USED FOR, OR TO FACILIATE, CRIMINAL ACTIVITY, INCLUDING BUT NOT LIMITED TO DRUG-RELATED CRIMINAL ACTIVITY, REGARDLESS OR WHETHER THE INDIVIDUAL ENGAGING IN SUCH ACTIVITY IS A MEMBER OF THE HOUSEHOLD, OR OTHERWISE.

4. NEITHER RESIDENT, NOR ANY MEMBER OF RESIDENT'S HOUSEHOLD OR GUESTS OR OTHER PERSONS AFFILIATED WITH RESIDENT, SHALL ENGAGE IN THE UNLAWFUL MANUFACTURING, SELLING, USING, STORING, KEEPING, OR GIVING OF A CONTROLLED SUBSTANCE AS DEFINED IN STATE OR LOCAL LAW, AT ANY LOCATIONS, WHETHER ON OR MEAR THE DWELLING UNIT PREMISES, OR OTHERWISE.

5. NEITHER RESIDENT, NOR ANY MEMBER OF RESIDENT'S HOUSEHOLD OR GUESTS OR OTHER PERSONS AFFILIATED WITH RESIDENT, SHALL ENGAGE IN ANY ILLEGAL ACTIVITY, INCLUDING PROSTITUTION, CRIMINAL STREET GANG ACTIVITY, THREATENING OR INTIMIDATING, ASSAULT INCLUDING BUT NOT LIMITED TO THE UNLAWFUL DISCHARGE OF FIREARMS, ON OR NEAR THE DWELLING UNIT PREMISES, OR IN ANY BREACH OF THE LEASE AGREEMENT THAT JEOPARDIZES THE HEALTH, SAFETY AND WELFARE OF THE OWNER OR MANAGEMENT, THEIR RESPECTIVE AGENTS OR EMPLOYEES, OR OF ANY OTHER TENANT, OR INVOLVING IMMINENT OR ACTUAL SERIOUS PROPERTY DAMAGE AS DEFINED IN APPLICABLE STATE OR LOCAL LAW.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A SINGLE VIOLATION OF ANY OF THE PROVISIONS OF THIS ADDED ADDENDUM SHALL BE DEEMED A SERIOUS VIOLATION AND A MATERIAL AND IRREPARABLE NON-COMPLIANCE. IT IS UNDERSTOOD THAT A SINGLE VIOLATION SHALL BE GOOD CAUSE FOR TERMINATION OF THE LEASE UNDER KRS 383.660. UNLESS OTHERWISE PROVIDED BY LAW, PROOF OF VIOLATION SHALL NOT REQUIRE CRIMINAL CONVICTION, BUT ONLY PROOF OF A VIOLATION BY A PREPONDERANCE OF THE EVIDENCE.

7. IN CASE OF CONFLICT BETWEEN THE PROVISIONS OF THIS ADDENDUM AND ANY OTHER PROVISIONS OF THE LEASE, THE PROVISIONS OF THE ADDENDUM SHALL GOVERN.

8. THIS LEASE ADDENDUM IS INCORPORATED INTO THE LEASE EXECUTED OR RENEWED THIS DAY BETWEEN OWNER AND RESIDENT.

RESIDENT

RESIDENT

RESIDENT

OWNER (BY ITS PROPERTY MANAGER)

Address: 2120 Manor Dr., Apt. # 135

Initials of all residents _____

1

P.26

# Pinnacle Realty Management Company
## Pet Addendum
## Lease Addendum

In connection with that certain Lease Agreement dated 08/17/01, for Apartment # 135, at Sonnet Cove Apartment Community, in Lexington, Fayette County, Kentucky and subject to conditions stated therein, Manager hereby grants permission for Resident to keep, in Resident's Apartment only, the pet described below upon the following terms and conditions:

1.  The (circle one: dog / cat / other _____ ) pets name is _____ and is M / F approx. _____ years old.
    <br>(sex)

2.  The pet is generally described by the following breed, height, weight and physical identifying characteristics:

3.  Resident hereby represents and warrants that the above-described pet had been properly licensed and inoculated as required by local law and Resident agrees to maintain such licensing and inoculation of the pet and to furnish Manager with evidence thereof promptly upon request.

4.  The pet shall be kept on a leash at all times when outside the Apartment and inside the Apartment Community. The pet shall not be exercised inside the Apartment Community except in designated exercise areas, if any. Resident shall not at any time leave the pet on a patio or balcony while away from the Apartment. Resident shall promptly collect and remove all pet defecations from the grounds of the Apartment Community.

5.  Resident has hereby paid to Manager $ 0 as an additional deposit securing Resident's performance under this Pet Addendum and the Lease Agreement. $ 0 of said deposit is a non-refundable fee. Manager may deduct from the refundable portion of the deposit all costs and expenses incurred by Manager in repairing all damages caused by the pet and any other damages resulting from the breach of the Pet Addendum or the Lease Agreement.

6.  Resident shall pay a monthly pet charge of $ 0 on the same date on which Apartment rent is due.

7.  Resident shall insure that the pet does not at any time disturb any other resident of the Apartment Community no damage any property located in the Apartment or in the Apartment Community. If, in the Manager's sole opinion and discretion, the pet has a disturbed or is disturbing any other resident or has caused or is causing damage to property in the Apartment or Apartment Community then Resident shall permanently remove the per from the Apartment and Apartment Community with ten (10) days after written request. Resident's failure to permanently remove the pet as provided above or failure to comply with all other terms of the Pet Addendum shall constitute a default permitting termination of the Lease Agreement.

8.  Except for the pet described above, Resident shall not keep any pets in the Apartment or within the Apartment Community without Owner's prior execution of an additional Pet Addendum.

9.  Resident's failure to comply with the terms and provisions of the Pet Addendum or violation of any representation or assurance contained in the Pet Addendum shall constitute a default permitting termination of the Lease Agreement.

In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of the addendum shall govern.

*I/We have read the policy, and I/We accept the terms.*

ALL RESIDENTS SIGN:

Resident

Resident

Agent for Owner

*I/We have read and understood the policy and declare that I do not have any pet (s) at this time. It is clear to me that should I/We wish to keep pet (s) in the apartment in the future, an application has to be filed with the Management Co. prior to doing so.*

ALL RESIDENTS SIGN:

Resident

Resident

Initials of all residents _____

1

**Sonnet Cove Apartments**
495 Laketower Dr.
Lexington, KY 40502
(859) 266-3123

Date: 08/17/01

Address: 2120 Manor Dr., Apt# 135

Names (s): Shea Johnson, Kathy Renfroe, Kathrine Haddix

License Plate # (s): __AUN___5855_____

Make and Model (s) of Cars: _Sahara - Jeep (2001) white     Purple seutra_
_old civic_

I/We am/are in receipt of # of Sonnet Cove parking sticker (s) and I/We understand that it is to be positioned in the passenger side of the front windshield in the bottom corner.

I/We understand that if my Sonnet Cove parking sticker is misplaced or lost, I/We will be charged a **$25.00 fee** to replace the sticker.

I/We understand that parking is strictly based on a first come first serve basis and I will notify my guest that it is necessary that they park on the street or that they have a temporary tag issued from the office. Vehicles parked in the Sonnet Cove parking lots will be towed at the owner's expense if they do not have a valid parking sticker placed on their car.

I/We understand that the sticker is the property of Sonnet Cove and is to be returned upon move-out or I /We will be charges $25.00 per parking sticker, that will be deducted from my security deposit.

Resident: _Katy E. Renfroe_

Resident: _____

Resident: _Shea E. Johnson_

Resident: _Ragan_____

Sonnet Cove Agent: _____

Sticker Number (s) issued: 4503,4502,4501

Initials of all residents_____

1

**Pinnacle Management**

## Tanning Equipment Use and Waiver and Understanding

Address: 2120 Manor Dr., Apt # 135

Date: 08/17/01

Before using any sun tanning equipment, you should consider the answer to each of the following questions in order to determine the effects that this equipment will have on you:

1. Are you frequently exposed to the sun?
2. Have you been subjected to a major sunburn?
3. Do you tan easily?
4. Do you have a tendency to burn?
5. Do you have any allergies to sunlight?
6. Are you taking any medication that would cause sensitivity to sunlight?
7. Have you ever been advised by a physician to stay out of the sun?

We advise you to consult with a physician before using tanning equipment if the answer to any of these questions is yes! In addition, the following precautions are necessary when using tanning equipment, these include, but are on limited to:

1. Using protective eyewear at all times.
2. Limiting your use to no more than 20 minutes per visit.
3. Do not wear jewelry in the tanning bed.
4. Be sure the time is set correctly before you start.

It is understood that all tanning equipment is made available to the resident for a nominal fee and its use is strictly voluntary. Because there is no conclusive long-term evidence that can guarantee the safety of tanning equipment, you understand that its use is entirely at your own risk. You agree **NOT** to hold the owners, management or their agents of this community liable for any visual impairment or skin disorders directly or indirectly resulting from the use of the community's tanning equipment. You also agree to follow all instructions listed above and posted in the tanning room.

I/We have read and understand the above release of liability statements and agree unconditionally:

Resident: _____

Resident: _____

Resident: _____

Resident: _____

Initials of all residents _____

1

# Pinnacle Realty Management Company

## Waiver of Liability for Use of the Exercise Facility and Equipment

I/We understand that:

### Graoch Associates
(Name of Owner)

### Sonnet Cove Apartments
(Name of property)

Pinnacle Realty Management Company and their affiliates, partners, directors, officers, agents, employees, representatives or servants, collectively known as "PINNACLE", does not accept the responsibility or liability for any injuries sustained by residents and resident's guests while using the exercise facility and equipment at:

### Sonnet Cove Apartments, 495 Laketower Dr., Lexington, KY 40502

I/We understand that I/We am/are using the exercise facility and equipment at my/our own risk. I/We assume all responsibility and waive any claim against PINNACLE for compensation or damages for any injury while utilizing the exercise facility and equipment, and hereby agree to defend, indemnify and hold PINNACLE harmless from and against any and all claims which may arise from, or are in any way connected with, my/our us (including use by any guest (s) of mine) of this exercise facility and equipment.

I/We also understand that PINNACLE does not provide any physical fitness instruction or training for my/our use of the exercise equipment.

_____
Resident

_____
Resident

_____
Resident

_____
Resident

Address: 2120 Manor Dr., Apt # 135
         Lexington, KY 40502

2

Initials of all residents _____

# Disclosure of Information on Lead-Based Paint and Lead-Based paint Hazards

**Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to your children and pregnant women. Before renting pre-1978 housing, landlords must disclose the presence of known lead-based paint and lead-based paint hazards in the dwelling. Tenants must also receive a federally approved pamphlet on lead poising prevention.*

**Lessor's Disclosure (initial)**

X _____ (a) Presence of lead-based paint or lead-based paint hazards (check on below):

☐      Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

X      Lessor has no knowledge of lead-based paint and/or lead-based pint hazards in the housing.

_____ (b) Records and reports available of lessor (check one below):

☐      Lessor has provided the lessee with all available records and reports pertaining to lead based paint    and/or lead-based paint hazards in the housing (list documents below)

_____

X      Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement (initial)**

_____ © Lessee has received copies of all information listed above

_____ (d) Lessee has received the pamphlet Protect Your Family from Lead in Your Home.

**Agent's Acknowledgement (initial)**

_____ (e) Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

## Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

_____  17 Aug 01        Shea L Johnson 8/20/01
Lessor      Date                    Lessor      Date

Kevin E. Pendral 8/17/01        Raza Jones 8/20/01
Lessor      Date                    Lessor      Date

_____ 8-20-01
Agent      Date

3

Initials of all residents _____

## SATELLITE DISH ADDENDUM

# DO NOT INSTALL A DIGITAL BROADCAST SIGNAL (DBS) SATELLITE DISH UNTIL YOU HAVE READ THE FOLLOWING GUIDELINES. THE FOLLOWING ARE FCC RESTRICTIONS ON THE PLACEMENT OF SATELLITE DISHES.

1. Installation of the dish and supporting devices is limited to inside the apartment OR completely within the perimeter of the private balcony or patio. The dish and supporting device cannot extend beyond or outside this space.

2. There can be no drilling of holes through exterior walls or structures. The dish or supporting device cannot be attached to exterior walls, railings, windowsills or other structures.

3. No part of the dish or antenna can extend beyond the balcony railing line or privacy fence. (Basically the dish must be supported by a "free standing" devise). Many residents have installed the dish onto a small stepladder or footstool that can be placed on the balcony or patio and can be taken in at night. As we maintain the grass area around the patios and buildings, neither the unit not supporting devise can be in the grass or mulch areas.

4. The resident with respect to both personal and physical damage must keep proper personal liability insurance in force. Our insurance carrier has determined a minimum of $500,000 coverage.

We will take the appropriate action to eliminate improper installation. We want you to be informed prior to incurring the costs associated with dish installation.

I agree and acknowledge the above policy.

Resident: _____  Date: 8/17/01

Resident: _____  Date: 17 Aug 01

Resident: _____  Date: 8/20/01

Resident: _____  Date: 8/20/01

2120 Manor Dr., Apt #135
Lexington, KY 40502

7

Initials of all residents_____

P. 32

December 2, 1998

Satellite Dishes and Other Antennae to TV or Other Signal Reception

**The following guidelines have been developed in conjunction with the most recent rulings of the Federal Communications Commission.**

It is the police of the owner to allow the use of satellite dishes and antennae for signal reception AS LONG AS the dish or antenna is located completely inside the rental unit.

The antenna or dish may be located on a patio or balcony if the patio or balcony is designated by lease to be within the exclusive use and control of the resident.

The following guidelines will be strictly enforced:

1) No antenna or satellite dish may be attached to the outside of any building, fences or railings as this will require the use of fasteners that will irreparable scar, stain, or otherwise damage an appearance surface of the property. No device may extend or protrude from the inside to the outside such that it occupies any space not contained within the rental unit.
2) No holes may be drilled or otherwise created in the outer surface of the buildings for the purpose of running wires or other connectors to the inside.
3) If the satellite dish or antenna will be located on balconies or patios and if the dish or antenna is visible from any other unit or from the common area, the resident will be required to screen the antenna or dish so that it is not visible from any other unit or the common area. *The manager shall be the sole judge as to the adequacy of the screening.* Therefore, it is strongly recommended that permission be secured in advance in writing.
4) The owner of the property explicitly denies permission to locate any satellite dish or antenna, or any other personal property, on or in any common area of the property, and will remove, without notice and at resident's expense any such devise found to be so located.

If a satellite dish or antenna is to be used outside the rental unit on a patio or balcony within the exclusive use and control of the resident in compliance with the above guidelines, the following must be provided to the owner of the property prior to the installation:

1) A legal document satisfactory to owner's legal consul indemnifying the property owner and management company from any damage or injury that occurs as a result of the installation and use of the satellite dish or antenna.
2) A liability insurance rider in the amount of $500,000 underwritten by an insurer acceptable to owner's insurer naming the owner and management company as additional insured against any damage or injury that occurs as a result of the installation or use of the satellite dish or antenna.

Upon receipt of the above documentation and detailed plans describing the installation, the owner will, upon ascertaining, in his sole opinion, that the installation meets the above guidelines, provided specific written permission for the use of the specific devises. It is strongly recommended that no device be purchased or contracted for until the user has received such permission.

Initials of all residents _____ KER _____

# PINNACLE REALTY MANAGEMENT COMPANY

Resident Name(s): Chea Johnson,Kathy Renfroe,Kathrine Haddix
Apartment Number: 135
Move In Date: 08/17/01

## UTILITY ADDENDUM

Lessor shall pay for (if initialed) __x__ water, __x__ sewage and storm water, __x__ trash disposal, _____ cable T.V., _____ master T.V. antenna. Tenant agrees to pay for all other utilities, related deposits and charges on the Lessee's utility bills for the entire term of the lease. Tenant shall be billed for gas and electric on a monthly basis for their proportionate share of the gas and electric bills based upon the total square footage of their unit with the common areas deducted therefrom. Payment for the gas and electric bills is due on the first of the month with the rental payment. If you fail to pay all utility charges assessed in connection with the use of the service, then Landlord may pay these utility assessments and demand immediate repayment of same from you additional rent pursuant to paragraph __32__ of this Lease Agreement as well as subtract from your security deposit upon termination of the lease all amounts so assessed by us that remains unpaid. Landlord shall in no event be liable for any interruption or failure of utility services furnished by us to the premises or any damages directly or proximately caused thereby.

_____ Date 17 Aug 01
Resident Signature

_____ Date 8/17/01
Resident Signature

_____ Date 8-20-01
Agent For Owner

Initials of all residents_____

5

Owner: **Graoch Limited Partnership #73**
Agent for owner, Sonnet Cove, 495 Laketower Dr., Lexington, KY 40502

### Concession Addendum

**Apartment Number** 135
**Date of Lease 08/17/01**

The Lease Agreement (the Agreement) dated 08/17/01 by and between SONNET COVE Apartments, hereinafter called the "OWNER" and **Chea Johnson, Kathy Renfroe, and Haddix**, hereinafter called the "RESIDENT" is amended as hereinafter set forth. Any language or provision in the Agreement which is inconsistent or in conflict with the following shall be deemed modified and amended.

Provided RESIDENT is not in default of the Agreement, OWNER will provide RESIDENT with the following lease inducements (Concessions) which are to be accounted for by OWNER and RESIDENT as follows (check one or both items)

_____ Each month's rent payment due throughout the term of the lease shall be reduced equally by $
so that the total rent shall be $.
**If ANY rental payment is received after the 1st of the month, no concession will be given for that month. The full rental amount will be due and payable.**

✓ One time rent credit in the amount of $432.00 off September will be credited on the first full month after move in (or renewal).

IT IS UNDERSTOOD AND AGREED by all parties that credit (s) noted above is (are) rental concessions (s) provided by the OWNER as in inducement to enter into a 12 months month lease agreement. If the RESIDENT is at any time in default of the Agreement, then in addition to the remedies provided in the Agreement (see default paragraph in body of Lease), any concession already received by or credited to the RESIDENT shall be immediately due and payable to the OWNER and any future concession shall be discounted. RESIDENT herby agrees in the event of default to repay any and all concessions received from the lease agreement date.

X _____
Resident's Signature

X _____
Resident's Signature

X _____
Resident's Signature

_____
Agent for community

Sonnet Cove
Community Name

8.20.01
Date

8/00/01

2711 Center Ville Road Suite 400, Wilmington DE, 19808 SEP 0 8 2003
(886) 690-2882    sop@cscinfo.com

United States Corporation Company          The Prentice-Hall Corporation System, Inc.

## NOTICE OF SERVICE OF PROCESS

Date Processed: 05-SEP-03                Transmittal #: NC1844204P      ALL

To: KAREN DEMEO, ESQ.                    Redirect sent to:
    KIDDE PLC, INC.
    700 NICKERSON ROAD
    MARLBOROUGH MA 01752

### TYPE OF REPRESENTATION:  Statutory

*We enclose the following documents which were served upon:*
                      The Prentice-Hall Corporation System, Inc.
*as registered agent in*  North Carolina    *for*
                      WALTER KIDDE PORTABLE EQUIPMENT INC. (ID#:  0202038)
→ *Documents were served on*  05-SEP-03  *via Certified Mail*      ID#: 70030500000180323518

Title of Action: MARSHA AND REGAN JOHNSON CO-ADMINISTRATRIX OF ESTATE OF Case #: 03CI03580
         vs.  WALTER KIDDE PORTABLE EQUIPMENT, INC.
     Court: FAYETTE CIRCUIT COURT DIVISION 5 KY
Nature of Case: Wrongful Death

| | | |
|---|---|---|
| X Summons | ___ Notice of Mechanic's Lien | ___ A self-addressed stamped envelope enclosed |
| X Complaint | ___ Notice of Attorney's Lien | ___ Duplicate copies of the Notice and Acknowledgement enclosed |
| ___ Garnishment | ___ Notice of Default Judgment | |
| ___ Subpoena | | |
| X Other:  EXHIBIT | | |

Answer Due: WITHIN 20 DAYS OF SERVICE
Documents Sent: Federal Express        ID#:
Call Placed: No call placed            Spoke to:  N/A
Comments: N/A

Attorney for Claimant:
     WILLIAM C. SHOUSE
     PO BOX 951
     LEXINGTON KY 40507

Form Prepared By:  Heather Hughes

### Original Client Copy - for your records

The information on this transmittal is provided for use in forwarding the attached documents. This information does not constitute a legal opinion as to the facts or details of this action. These should be obtained from the documents themselves. The receiver of this transmittal is responsible for interpreting the documents and for taking appropriate action. If you have received only a copy of the transmittal, you should be aware that the documents have been sent to the original addressee. You should contact that addressee for details or interpretations of the content of those documents.



COMMONWEALTH OF KENTUCKY
OFFICE OF THE SECRETARY OF STATE
P. O. BOX 718
FRANKFORT, KENTUCKY 40602-0718

JOHN Y. BROWN III
SECRETARY OF STATE

SERVICE OF SUMMONS
PHONE 502.564.2848 EXT. 440
FAX 502.564.4075

*KIDDE, WALTER PORTABLE EQUIPMENT, INC. IND./D/B/A KIDDE SAFETY OR WAL*
*PRENTICE HALL CORP. SYSTEMS, INC. ,AGT.*
*327 HILLSBOROUGH ST*
*RALIEGH, NC 27602*

FROM: SUMMONS DIVISION
SECRETARY OF STATE

RE: *CASE NO: 03-CI-03580*

COURT: *Fayette Circuit*

*Lexington, KY 40507*

DATE: *September 3, 2003*

*Suit has been filed against you in the captioned case. As provided under Kentucky law, a copy of the legal documents is enclosed.*

*Questions regarding this suit should be addressed to:*

*(1) Your attorney, or*
*(2) The attorney filing this suit, or*
*(3) The court or administrative agency in which the suit is filed*

*The Kentucky Secretary of State has NO POWER to make a legal disposition of this case. Your responsive pleadings should be filed with the clerk of the court or agency where the suit is filed and served directly on your opposing party.*

*No copy of future pleadings need be sent to this office unless you wish us to serve the pleading under a particular statute or rule and pay for said service.*

| AOC-105<br>5-90<br><br>Commonwealth of Kentucky<br>Court of Justice<br><br>CR 4.02; CR Official Form 1 | **CIVIL SUMMONS** | Case No. __CIRCUIT Court__<br><br>Court _____ FAYETTE _____<br><br>County _____ |

Marsha Johnson and Ragan Johnson,
Co-Administratrix of the Estate of Shea Johnson

V.

Walter Kidde Portable Equipment, Inc;
Individually, and/or d/b/a Kidde Safety;
and/or Walter Kidde Smoke and Fire Alarm

Serve:

Agent for Service of Process:
Prentice Hall Corporation Systems, Inc.
327 Hillsborough St.
Raleigh NC, 27602
Secretary of State
Comonwealth of Kentucky
Frankfort, KY 40601

THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANTS:

You are hereby notified that a legal action has been filed against you in this court demanding relief as shown on the document delivered to you with this summons. Unless a written defense is made by you or by an attorney in your behalf within 20 days following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding such relief against you or his (their) attorney(s) are shown on the document delivered to you with this summons. WILMA F. LYNCH, CLERK
FAYETTE CIRCUIT COURT
FAYETTE COUNTY
120 N. LIMESTONE STREET C103
LEXINGTON, KENTUCKY 40507

Date: __AUG 2 6 2003__ _____

Clerk: _____

By: _____ D.C.

**PROOF OF SERVICE**

This summons was served by delivering a true copy and the complaint (or other initiating document) to:

_____

This _____ day of _____, 19_____.

Served By: _____

483288.1